S. H. ISLER v. S. W. ISLER, Executor.

*Burnt Records—Evidence—Sale of absolute estate by life-tenant— Rights of Remainderman.*

1. Under the act in reference to burnt or lost records, the recital of a record contained in a deed executed by virtue of court proceedings prior to 1865, is *prima facie* evidence of the existence and validity of the record ; and the deed, of the decree upon which it purports to be founded. Bat. Rev., ch. 14.

2. Where one holding only a life estate in property sells the absolute interest, the remainderman has an equity to have the price received, with interest from the death of the life-tenant.

3. The money paid for a slave sold by a life-tenant takes the place of the property, and the remainderman is entitled to the same, at the death of such tenant, if he elect to ratify the sale. There is no distinction in principle between the destruction of such property by death or by emancipation.

(*McKeil* v. *Cutlar*, 4 Jones' Eq., 381 ; *Lee* v. *McBride*, 6 Ired. Eq., 533 ; *Lewis* v. *Kemp*, 3 Ired. Eq., 233 ; *Lewis* v. *Mobley*, 4 Dev. & Bat., 323 ; *Haughton* v. *Benbury*, 2 Jones' Eq., 337 ; *Jones* v. *Baird*, 7 Jones, 152 ; *Cheshire* v. *Cheshire*, 2 Ired. Eq., 569, cited, commented on and approved).

CIVIL ACTION tried at February Special Term, 1882, of WAYNE Superior Court, before *Avery, J.*

The plaintiff brought this action to recover his share of certain property alleged to have been sold by the defendant's testatrix, under the circumstances set out in the opinion. The defendant appealed from the judgment.

*Messrs. Faircloth & Allen,* for plaintiff.
*Messrs. Battle & Mordecai,* for defendant.

RUFFIN, J. This court can perceive no error in any of the rulings made in this cause in the court below, or in the judgment that was there rendered in behalf of the plaintiff.

As made by the pleadings, the proofs, and the verdict of the jury, the case is as follows:

Simmons Isler, senior, died in 1839, leaving a last will in which, after making certain specific legacies, he devised and bequeathed all the residue of his estate of every kind to his widow, Barbara M., for life, with remainder to such of his children as should marry or arrive at full age, to be equally divided among them. He had four children, two of whom died childless and unmarried in the life-time of their mother, leaving the plaintiff and the defendant as the only persons to take the property so given in remainder. Amongst the property thus disposed of was a tract of land situate in Brunswick county, and two slaves, London and Claiborne.

In 1851, upon a petition filed by the said Barbara M., in her own name and those of her children, then infants, by herself as their next friend and guardian, the said tract of land was sold under a decree of the court of equity of said county of Brunswick, when one Bryan became the purchaser at the price of $2,500, and, upon confirmation of the sale and the payment of the purchase money, took a deed from the master conveying the land to him in fee. The whole of this purchase money was paid to the said Barbara M., who kept the same and used it as her own.

In 1840, the said Barbara M. sold the slave, London, at the price of $1,000, which money she also received and kept as if her own—the sale being an absolute one and not confined to her own life interest, and being to a speculator, upon a distinct understanding that he was to be carried out of the state.

In 1851, she sold the slave, Claiborne, at the price of $600, which sum she received and used as the other—this sale being

73

an absolute one also, and followed by the disappearance of the slave from that part of the country.

In 1879, the said Barbara M. died, leaving a will in which she gave much the greater part of her estate to the defendant, whom she also appointed her executor, in which capacity he is now sued.

The first exception taken was to the admission of certain testimony. After having shown that in 1865 the records of the court of equity for Brunswick county had been destroyed by the federal troops, who then occupied the town (Smithville), and who wantonly took them from the files and scattered them upon the streets, the plaintiff offered in evidence the deed which was made to the purchaser, Bryan, by the master, for the land in question, it being his object to show by its recitals, that the land was in fact sold under a decree of the court, in a proceeding instituted in the names of the said Barbara M. and her infant children, she representing the latter as their guardian or next friend. This was objected to by the defendant, but admitted by the court, and we think properly so. The deed bears date in December, 1851, and the case, therefore, falls distinctly under the act of 1871–'72, which provides that a recital of a record of any court, the records of which may have been destroyed, contained in any deed executed prior to 1865, by any officer or commissioner authorized by law to execute the same, shall be deemed *prima facie* evidence of the existence and validity of the record referred to, and shall to all intents be valid against persons mentioned in the deed as being parties to the record, and all others claiming under them, and that said deed shall be admitted as *prima facie* evidence of the existence and validity of the decree or record upon which it purports to be founded. Bat. Rev. ch. 14, §§ 19 and 20.

The second exception was, that the court declined to instruct the jury that there was no evidence that the defendant's testatrix ever received any money from the clerk and master, as the proceeds of the land sold under the decree.

The complaint in terms alleges that she did receive the sum of $2,500 from that officer, and that the same arose from the sale of the Brunswick land sold by the order of the court, and this, if not admitted in the answer, is certainly not denied, and, therefore, the instruction asked for could not properly have been given.

Third. The defendant insisted, and requested the court so to charge, that inasmuch as a presumption of the death of the two slaves, London and Claiborne, had arisen, or in case of their being alive, their emancipation had occurred before the death of the life-tenant, the plaintiff was not entitled to recover of her estate.

Scarcely any question seems ever to have perplexed the court so much, as that which had reference to the manner of granting relief, and the extent to which it should be granted, to one who had a vested remainder in a slave dependent upon a life-estate, in case he should be sold by the tenant-for-life. It is impossible to reconcile the various decisions bearing upon the question; nor is it necessary that we should attempt it, for they all concur in saying that in such a case he in remainder is entitled to some relief, provided the sale be fraudulently made; and according to what seems to be the weight of authority, an absolute sale of the whole interest is of itself evidence of fraud.

In *McKeil* v. *Cutlar*, 4 Jones' Eq., 381, it is held to be clearly against conscience for one holding only a life-estate to sell the absolute interest, and if done, that the remainderman had a plain equity to have the price received, with interest from the death of the life-tenant; and in *Lee* v. *McBride*, 6 Ired. Eq., 533, a sale of the whole interest in such a case is put upon the same footing with the act of sending the slave abroad, with an intent to baffle the remainderman in search for him.

Again, the court say, in *Lewis* v. *Kemp*, 3 Ired. Eq., 243, that it is an act of bad faith for a life-tenant, either to sell the whole interest in the slave, or to sell him for the purpose of his being carried out of the state—and this appears to us to be the only sensible rule, since the same kind of inconvenience and danger to

the remainderman, if not the same in degree, is as likely to result from the one act as the other.

Some uncertainty, too, has been thrown upon the right of the remainderman to have the price paid for the slave, in case he should die after the sale and before the death of the life-tenant.

In the case last cited, as well as in *Lewis* v. *Mobley*, 4 Dev. & Bat., 323, it was held that if the slave should die during the continuance of the life-estate, the remainderman could have no claim upon the estate of the tenant-for-life for the price for which he had been sold, and it was also declared that if unheard of for more than seven years, the courts would presume him to be dead. Yet in *Haughton* v. *Benbury*, 2 Jones' Eq., 337, the court declared, without any reservation, that although a slave, who had been sold with intent to defraud one owning him in remainder, had died during the pendency of the life-estate, still the remainderman might, at his election, ratify the sale, and thus entitle him to some portion of the purchase money, and a rule was laid down for its apportionment between him and the estate of the life-tenant, differing from that suggested in any other case.

And again in *Jones* v. *Baird*, 7 Jones, 152, the last case touching the point, a very grave doubt is expressed, whether the doctrine of the presumption of death, arising from the fact that the party had not been heard from for seven years, could under any circumstances be applied to slaves.

Seeing the authorities to be thus uncertain and in some instances contradictory, the court feel at liberty to adopt their own rule with regard to the matter, and to them none seems so simple or just as the one laid down in *McKeil* v. *Cutlar*, *supra*, which was also recognized in *Cheshire* v. *Cheshire*, 2 Ired. Eq., 569, allowing the price paid to represent the slave and to be enjoyed by the life-tenant during the residue of his life, and then to go without abatement to him in remainder, provided he shall elect to ratify the sale and take the fund.

By such a ratification the title of the purchaser is made good from the date of his purchase, and, if the slave sold had been a

female, would have entitled him to all of the children born of her body, and who might have survived her. Why, then, should not the money completely take the place of the property, and go just as the latter was intended to go?

It was upon this principle that His Honor below seems to have rested his decision, and in so doing he committed no error. There can be no distinction in principle between the destruction of the property by death or by emancipation.

The judgment of the court below is therefore affirmed.

No error.                                                Affirmed.